## Berry v. Riess.

Nov. 18, 1938.

NATHAN KAHN and DAVID A. McCANDLESS for appellant.
R. P. DIETZMAN and J. WHEELER CAMPBELL for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing on appeal and affirming on cross-appeal.

On and prior to September 18, 1936, the appellee and defendant below, Fred Reiss, owned a boundary of land in Jefferson county, "about one mile east of Anchorage, Kentucky," upon which there was located a rock quarry which had been opened and equipped for a number of years, but it had been idle for some months preceding the above date. The last operator was the city of Louisville in procuring rock for its streets. On the date indicated defendant executed a written contract to plaintiff, whereby he leased to plaintiff the quarry, machinery and appurtenances for a period of ten years from that date, upon consideration of one dollar, which the lease recites was then and there paid, and other obligations assumed by the lessee, among which was an agreement to pay the lessor (defendant) ten cents per ton for rock mined and taken from the premises during the term of the lease.

Plaintiff was experienced in the quarrying business, but was then without customers and, of course, had to procure them before he could commence operating the quarry. About that time the project of improving Kentucky Highway No. 60 from Louisville, Kentucky, to Shelbyville, Kentucky, was launched and perhaps, work had already commenced. Plaintiff immediately began efforts to obtain contracts for various types of crushed rock, but his success was, as charged in the petition (and also testified to), more or less obstructed and impeded by interferences from defendant in conversing with ap-

proached and prospective customers by plaintiff and dampening any disposition on their part to deal with him. Some success in procuring contracts, however, was made by him, but not sufficient to justify working the quarry in the absence of enough customers to consume his product. Such was the condition of affairs on March 3, 1937, on which date defendant wrote plaintiff a note saying: "I hereby notify you that I am canceling the contract that you have on the quarry at Avoca, cancellation to take place today, 3-3-37."

On the next day plaintiff responded thereto by letter in which he denied the defendant's right to cancel the lease, and stated therein: "I am making every effort to get started according to the terms of my lease dated September 18, 1936. Any change of your mind on this lease does not effect the status of same." Following that response defendant filed a declaratory judgment action against plaintiff, and in his petition he set out the facts as he contended they existed at that time, and asked for a cancellation of the written lease, and for other relief to which he considered himself entitled. That action progressed to a stage where the presiding chancellor before whom it was pending indicated his opinion that plaintiff therein (defendant here) was not entitled to the relief he sought; whereupon he dismissed his action without prejudice. An agreement was then reached as the result of negotiations and it was reduced to writing on June 12, 1937, whereby the contentions of the parties growing out of the original lease were agreed to be settled and compromised on the terms stated therein. They were—that defendant (who in the meantime had taken possession of the quarry and was operating it) agreed to furnish to plaintiff without cost, "free on board trucks," 2,000 tons of No. 8 crushed rock during the times and in the quantities of, 200 tons before the 19th day of June, 1937; 500 tons before the 1st of July, 1937; 800 tons during July, 1937, and 500 tons during August, 1937. It was then stipulated in that compromise agreement that "If the first party fails to furnish all of said two thousand (2000) tons of crushed rock as above stated to second party, then this agreement shall be null and void, and the status of the disputed lease and contract, dated September 18, 1936, shall be thereafter as if this agreement had never been entered into, and as if the second party had himself quarried said rock from the premises, and free of cost. In

consideration of which it is hereby contracted and agreed that when and if said agreement of the first party be performed at the times and as above stated, then said lease and contract dated September 18, 1936, shall be canceled and become null and void; otherwise to remain in full force and effect."

Following those provisions the compromise agreement further stipulated that all claims of either party against the other should be discharged and canceled if. the compromise agreement was carried out and the original lease became cancelled as a result thereof. After the execution of the compromise agreement plaintiff began sending his trucks to the quarry to obtain the 2,000 tons of rock that was agreed to be furnished him under it. They (or those of his customers) continued to apply almost daily for the grade of rock agreed to be delivered, but failed to rèceive anything like the quantity agreed to be furnished, and on many trips (perhaps the majority of them) they were unable to receive any at all. One excuse for such failures, as testified to by the witnesses, was that those in charge of the quarry said that the state highway commission was taking all of that grade of rock that the quarry was producing. However, on some occasions there was a quantity of the required grade of rock on hand but which was spotted, and which means that it was piled on the ground—in which condition it could be loaded into trucks only by hand shovels or steam shovels and not from bins. On most of the occasions when that condition existed (which was infrequent) the truckmen would not wait for the rock to be loaded by hand which was the only method proposed to be employed by defendant in fulfilling his agreement to deliver the rock "free on. board trucks." The refusals on the part of the drivers to accept that method of loading was because they (and also plaintiff) contended that the process of loading on the trucks—contemplated by the compromise agreement —was by mechanical devices or steam shovel, and not by hand, since the truck drivers were paid by the hour and it took upon an average of thirty minutes to load a truck by hand.

At any rate, at the expiration of the month of August, 1937, when the last deliveries were to have been made under the terms of the compromise agreement, only about 106 tons of rock had been delivered. On the

31st day of that month plaintiff addressed a letter to defendant reciting the fact of such non-delivery and informing the addressee of his (plaintiff's) election to restore the terms of the original lease of date September 18, 1936, and to take immediate charge of it pursuant to the provisions therefor contained in the compromise agreement.

In the meantime plaintiff had agreed to sell to one Louis Ewall (who operated several quarries) a number of tons of No. 8 crushed rock which he expected to obtain from defendant in fulfillment of the compromise agreement. The contractors to whom Ewall was delivering the rock agreed to be furnished him by plaintiff were pressing for immediate deliveries. Therefore, both Ewall and defendant persuaded plaintiff to agree to an extension of time for the fulfillment of the compromise agreement by defendant, whereby the latter agreed to give plaintiff priority in the production of the quarry so as to enable him to obtain 100 tons per day until the balance of the 2,000 tons were delivered as agreed to in the written compromise agreement. But the evidence shows quite conclusively that plaintiff—in orally agreeing to the extension—did so on the express condition that if the oral extension was not complied with according to its terms, then his rights to restore the original lease, as reserved in the written compromise agreement, should be preserved. It is upon the finding as a fact that such oral reservation was actually made that this opinion in part is rested. We so state because the issue of fact regarding it is practically undenied by any testimony adduced by the defendant, and it is testified to by the latter and a Mr. Ireland and, perhaps, others. It is, therefore, practically admitted.

After making the oral extension plaintiff began the same efforts to obtain the balance of the rock due him from defendant, but he was met with the same character of obstructions and refusals hereinbefore related. They were continued throughout a period of about 50 days, during which time he received slightly more than 500 tons, which, with the amount he received before the oral extension, made a total amount delivered to him under the compromise agreement as so extended of 674 tons, as he contends, but 805 tons as defendant contends. The difference is not material, since the controlling fact is that only about 1/3 of the amount of rock agreed to be

delivered under the compromise agreement was ever received by plaintiff, leaving 2/3 of the consideration for that contract unexecuted.

After the expiration of 50 days following the oral extension of the compromise agreement, plaintiff filed this declaratory judgment action against defendant, setting up the facts hereinbefore recited, and in his petition he prayed for an injunction preventing defendant from interfering with his taking charge of the quarry under the original lease, and commanding defendant to turn it over to him, and that his title thereto be quieted. Defensive pleadings contested the facts upon which plaintiff claimed the right to be restored to the benefits of his lease, and further that it was unenforceable for the want of mutuality, which latter question is the only one involved on the cross appeal, which was granted by us on defendant's motion therefor.

Considerable evidence was taken and on submission the learned chancellor found the facts as recited above and which was in accord with plaintiff's contention with reference thereto. However, he concluded that the parol extension of the time for the performance by defendant of the written compromise agreement operated as a waiver of plaintiff's right to be restored to the benefits of his original written lease. In his written opinion, which was made a part of the record, the court said: "I am satisfied that the defendant has not endeavored to carry out said supplemental contract, and I might in this connection say that I am satisfied that the original contract was not procured by fraud."

Having stated his findings of fact in his opinion— and having stated his conclusion of law that the oral extension of the compromise agreement waived plaintiff's right of restoration to the lease contained in that agreement—the court then declared its determination of what should be adjudged in the premises, the substance of which was: That defendant had failed to deliver according to contract 1,326 of the 2,000 tons of rock agreed to be delivered under the written compromise agreement as extended, which he was ordered and adjudged to do following the rendition of the judgment, at the rate of 100 tons per day after being notified by plaintiff of his desire to receive it, and that the delivery to and receipt by plaintiff in that manner of such balance would satisfy and terminate all rights of the par-

ties in the premises. From that judgment plaintiff prosecutes this appeal, and defendant, as we have stated, moved for and obtained a cross appeal. Since the cross appeal raises the question of the validity of the original lease we have concluded to determine that legal issue first.

In support of that contention learned counsel rely on two clauses of the original lease, one of which says: "This indenture is made with the express proviso, that if no rock is quarried, as now contemplated by the said parties within the period of one year (1) from the present time, then these presents, and everything contained herein shall and forever be null and void." The other one says: "It is further agreed, that, if the party of the second part suspend operation of the said quarry before the expiration of this lease that he will immediately upon suspension quit the premises and give lessor full and complete possession." In expressing our view upon the legal effect of those excerpts from the lease we will dispose of the second one first.

Learned counsel appear to interpret it as giving the right to the lessee to terminate the lease at any time after he begins operation thereunder at his pleasure but without entailed liability therefor. We do not so construe it. On the contrary, we conclude it should be interpreted as being nothing more than an agreement on the part of the lessee to peaceably and voluntarily surrender the leased property to the lessor without compelling the latter to resort to court proceedings therefor whensoever the lessee suspends operating the leased property, and which would thereby suspend the lessor's obtention of the reserve royalty. The language does not purport to exonerate the lessee from responding in damage that might be sustained by the lessor as a consequence of such suspension, or to in any wise curtail the latter's rights flowing therefrom. We so conclude because it will be presumed that the parties intended to create mutual and enforcible obligations in favor of each other by the language they employed in their contract, rather than to accomplish nothing thereby. In other words, a writing purporting to set forth a contract will be upheld as valid, rather than construed as invalid, wherever it can be done without doing violence to the terms in which it is expressed. But however that may be, the determination of the legal issue now under con-

sideration is more dependent, or exclusively so, upon the correct interpretation of the first excerpt supra from the lease than upon that of the second one.

It is the argument of learned counsel for the lessor that the first excerpt referred to renders the leased contract unilateral, and which in turn is based upon the further contention that the one dollar consideration agreed to be paid by the lessee to the lessor is not a valuable one, nor—according to their contention—is there any other valuable consideration found in other parts of the lease contract. In support of that argument we are cited to a number of opinions of this court of which those of Berry v. Frisbie, 120 Ky. 337, 86 S. W. 558, 27 Ky. Law Rep. 724; Young v. McIllhenny, Ky., 116 S. W. 728; Killebrew v. Murray, 151 Ky. 345, 151 S. W. 662, and Soaper v. King, 167 Ky. 121, 180 S. W. 46, form a class. In those cases, or at least some of them, this court announced the rule that one dollar was not a valuable consideration; but they and all others adhering to that declaration were overruled by us in the case of Union Gas & Oil Company v. Wiedemann Oil Company, 211 Ky. 361, 277 S. W. 323. The route traveled by which that was done, and the reasons therefor—together with authorities in support thereof—may each and all be ascertained by reading that opinion, and for which reason we deem it unnecessary to repeat them in this one. Suffice it to say that we concluded in that overruling opinion that our unit of value of one dollar was still something of value, and that it, with the other obligations assumed by the one paying it, constituted a sufficient consideration for the contract entered into.

The one dollar expressed consideration in this case (and which was tendered but refused) paid for the right of plaintiff to postpone the beginning of active operation of the leased property until before the expiration of its first year, during which time he might make all necessary preparation to dispose of his product after he commenced. However, his lease forced him to commence within that year, and there is nothing contained in it giving him the right to suspend operation thereafter, since all that he agreed to do in the second excerpt, which we have inserted from the lease, was to peaceably surrender possession thereof to the lessor if he should violate its terms so as to entitle the lessor to its possession. The relationship between the parties created

by the lease is tantamount to this: That the lessor (defendant) in consideration of one dollar paid by the lessee (plaintiff) and the latter's promise to pay ten cents per ton for all rock mined after he commenced operation, agreed to give the latter a twelve months' option in which to determine whether he would operate the lease for the other nine remaining years of its entire term. The option was a property right, and for which plaintiff paid his dollar. Under the principles announced in the Union Gas & Oil Company Case, supra, such a contract is not without consideration, nor is it unilateral, but valid and enforceable. The other cases cited by learned counsel in support of his contention now under consideration not listed supra are far different in their facts from this one, and from those contained in the Union Gas & Oil Company Case. We, therefore, conclude that this legal issue should be determined in favor of plaintiff.

What we have hereinbefore said disposes of all the other contentions which rest chiefly upon the finding of facts—among which is that defendant without legal cause refused to furnish plaintiff the rock promised under the compromise agreement, and in quantities specified, at the times fixed; nor did he do so in accordance with the terms of the oral extension of the written compromise agreement. We also find from the evidence that in making the oral extension plaintiff reserved the rights growing out of the two former writings. Furthermore, that the testimony preponderates in favor of the contention of plaintiff that the customary method of loading trucks at rock quarries was by mechanical devices or machinery whereby a quick loading could be made, and not by hand whereby expensive delivery would be incurred. Defendant's witnesses, who weakly testified to the contrary, embraced, as a part of their understanding of the custom, the loading of railroad cars, which, of course, created no increased expense through loss of time by hand loading while remaining fixed on the railroad track during the process of loading, and which, of course, entailed no expense on the carrier or the transporter of the product. Having reached such conclusions, it necessarily follows that plaintiff was entitled to be restored to his rights under the original lease and to require defendant to cease its operations and to surrender possession of the lease property to him.

But the court in its judgment, which conformed to his opinion hereinbefore referred to, made a new contract for the parties and which neither of them asked. The court was correct in saying in his opinion that "A court of chancery has broad power and can do what he thinks should be done." But that principle—though sound in circumstances calling for its application—may not be broadened so as to authorize a court to direct the delivery of potatoes in satisfaction of a contract for the purchase of apples when the litigation concerns only the right to recover the latter. We, therefore, conclude that the court misapplied the equitable principle to which he referred in rendering the judgment appealed from.

Wherefore, for the reasons stated, its judgment is reversed on the appeal and affirmed on the cross appeal, with directions to enter one in lieu thereof adjudging plaintiff the right to the possession of the leased premises with its appurtenances, and directing defendant to turn same over to him, and for other proceedings consistent with this opinion; the whole court sitting.